# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

United States of America,

v.                                Case No. 1:22-cr-171-MLB

Carl Delano Torjagbo,

                Defendant.

_____/

## ORDER

A grand jury indicted Defendant, charging him with multiple counts of fraud and other crimes related to his alleged misappropriation and misuse of funds under the Paycheck Protection Program ("PPP"). (Dkt. 110.)  Defendant moves to: (1) suppress statements he gave FBI agents, (2) strike an alleged alias from the indictment, and (3) sever and separately try two counts of fraud related to his allegedly filing fraudulent tax documents.  (Dkts. 44; 81; 88; 115.)  Magistrate Judge Cannon issued a Final Report and Recommendation (R&R) saying this Court should deny the motion to suppress and motion to strike.  (Dkt. 128.)  The Magistrate Judge deferred to the Court a ruling on the motion

1

to sever.  (Dkt. 134.)  Defendant objects.  (Dkt. 132.)  The Court adopts the R&R.

## I.    Standard

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made." Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020)[1]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with.").  "Frivolous, conclusive, or general objections need not be considered by the district court."  *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

"It does not appear that Congress intended to require district court

---

[1] The Court recognizes *McCullars* is unpublished and not binding.  The Court cites it and other unpublished cases as instructive, nonetheless. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472 (11th Cir. 2016). Ultimately, whether or not objections are filed, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## II.    Background

According to the indictment, in early 2021, Defendant created a sham business—Kremkov Industries—and filed a PPP loan application on its behalf. (Dkt. 110 at 2–3.) As part of the application, Defendant certified Kremkov was "in operation on February 15, 2020," had 493 employees, averaged a monthly payroll of $3,821,770, and a loan was "necessary to support the ongoing operations of [the business]." (Dkt. 110 at 3.) Defendant swore the information he provided in the application and all supporting documents were "true and accurate in all material respects," but he allegedly "knew and had reason to know that the

application contained materially false and fraudulent misrepresentations." (*Id.*) After Defendant submitted the application, Chase Bank transferred him $9,554,425 in PPP loans. (Dkt. 110 at 4.) Rather than using this money to fund payroll for Kremkov, Defendant allegedly spent some of it on "personal debts and expenses and to fund a lifestyle for himself that he otherwise could not have afforded." (Dkt. 110 at 6–8.) Four months later, Defendant petitioned to change his name to Karl Lucius Delano. (Dkt. 110 at 7.) He then purportedly spent more of the PPP money to buy property under the name of Karl Lucius Delano and to pay startup expenses and buy property for a different company he created. (*Id.*) The indictment also claims Defendant defrauded the IRS by filing false tax documents and receiving tax returns on behalf of Kremkov. (Dkt. 110 at 12.)

A grand jury indicted Defendant on May 10, 2022. (Dkt. 1.) A couple days later, FBI agents arrested Defendant and interviewed him. (Dkt. 94 at 7.)[2] In September 2024, the United States filed a superseding indictment that remains operative. (Dkt. 110.) Defendant moves to

---

[2] When referencing transcripts, the Court cites the pagination of the transcript rather than that of the CM/ECF system.

suppress statements he made during the FBI interview and to strike from the indictment certain details about the Karl Lucias Delano alias. (Dkts. 44; 81; 88.)    Magistrate Judge Cannon issued an R&R recommending the Court deny those motions. (Dkt. 128.)  Defendant objects. (Dkt. 132.)  Defendant also moves to sever the tax-related counts and try them separately. (Dkt. 115.)  The Magistrate Judge deferred that motion for a decision by this Court.  (Dkt. 134.)

### III.  Motion to Suppress

Defendant moves to suppress statements he gave the FBI during his interview, arguing he did not voluntarily waive his rights to silence and counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966) before offering speaking to federal agents.  (Dkts. 44; 88.)

### A.    Standard

"Before the [United States] can introduce a defendant's uncounseled, self-incriminating statements made during a custodial interrogation, the [United States] must show that the defendant knowingly and voluntarily waived his *Miranda* rights[.]" *Schoolcraft v. Warden, G.S.P.*, 2023 WL 7014049, at *3 (11th Cir. Oct. 25, 2023).  The United States must show the defendant's waiver (1) "was the product of

a free and deliberate choice rather than intimidation, coercion, or deception," and (2) was "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (internal quotation marks and citation omitted).  When considering whether the "totality of the circumstances" shows the defendant's voluntary waiver, courts consider the defendant's education and intelligence, whether law enforcement apprised the defendant of his or her rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

### B.    Defendant's Arrest and Interview

To effectuate Defendant's arrest, ten agents surrounded him in three or four vehicles.  (Dkt. 94 at 24–27.)  They exited their vehicles with their guns drawn, pointed their guns at Defendant, identified themselves as FBI agents, and (at least one agent) yelled, "get down on the ground," and "show your hands."  (Dkt. 94 at 8, 26–28.)  The agents were wearing bulletproof vests with FBI placards on the front and back.  (Dkt. 94 at 9.) Defendant complied with the agents' commands, and the agents

handcuffed him behind his back while he was on the ground.  (Dkt. 94 at

9, 27.)  According to one of the agents, they returned their guns to their

holsters once they had done so.  (Dkt. 94 at 9.)

Agents placed Defendant in the back seat of one of their vehicles to

interview him.  (Dkt. 94 at 9.)  They moved his cuffed hands from his back

to his front.  (Dkt. 94 at 10.)  One agent testified she thought the cuffs

were loose enough that they would not cause Defendant any pain.  (*Id.*)

The agents began an audio recording and read Defendant his *Miranda*

rights.  (Dkts. 94 at 10–13; Dkt. 145 at 2–3.)[3]  Defendant waived those

rights orally and in writing.  (*Id.*)

The interview lasted 42 minutes.  (Dkt. 91-1.) Generally, the agents

questioned Defendant about his personal background; his PPP loan

application; the formation and operation of Kremkov; Defendant's

---

[3] Defendant initially objected to the Magistrate Judge's use of a
transcript of the interview created by the Court.  (Dkt. 132 at 1–2.)  The
Court filed the transcript on the docket and gave the parties an
opportunity to object to its accuracy.  (Docket entry dated 12/30/2024.)
The parties each object to certain portions of the transcript that either
contain minor typographical errors, find something a speaker said
unintelligible, or identify the wrong agent speaking.  (Dkts. 149; 151.)
None of the errors affect the Court's analysis, so the Court relies on the
transcript.

expenditures after he obtained the PPP money; the formation, assets, and employees of the new company he allegedly created with the PPP money; and various pieces of property owned by Defendant that the United States intended to seize. (Dkts. 91-1; 94 at 34–35; 145.)  Pertinent here, the agents specifically questioned Defendant about the number of employees he had at Kremkov and where the employees were located. (Dkt. 145 at 11.)  Defendant explained the company conducted mining activities primarily in Africa, so most of its employees lived there.  (Dkt. 145 at 12–13.)  When asked how many employees Kremkov had in 2020 and 2021, Defendant responded, "probably about 50."  (Dkt. 145 at 14.) When asked how many Kremkov employees lived in the United States, Defendant said "honestly, off the top of my head, I don't know."  (*Id.*)  The agents continued this line of questioning, asking Defendant the highest number of employees he ever had.  (*Id.*)  Defendant said his business has a high turnover and he did not know off the top of his head.  (*Id.*)  One of the agents told him to "take a guess—a guesstimate.  I mean, is it 50?  Is it 100?  Is it 10?"  (*Id.*)  Defendant repeated he could not honestly answer the question.  (*Id.*)

The agent then tried a different approach.  He asked Defendant how

much he pays his employees, to which Defendant responded, "It depends on how many people are, you know, digging and mining at the time." (Dkt. 145 at 15.)  The agent then asked approximately how many people Defendant paid; Defendant again said, "Like I said, I don't know off the top of my head because it's a high turnover."  (*Id.*)  The agent then said, "Just take a guesstimate.  I'm not going to lock you into it.  I mean, just a rough guesstimate."  (*Id.*)  Defendant responded, "A rough guesstimate, maybe 50, 60."  (*Id.*)

Next, the agent returned to his questions about employee pay.  He asked Defendant how much he paid his employees on an annual or quarterly basis.  (Dkt. 145 at 15.)  He responded, "Like I said, those are hard figures and I don't know off the top of my head.  So honestly I don't want to answer that question."  (Dkt. 145 at 15–16.)  The agent replied, "Are you sure you want to tell me this stuff because it's not really going to help you?"  (Dkt. 145 at 16.)  Defendant said, "I know that, but I don't want to tell you something which is wrong and then . . . it'll appear as if I'm deceiving you or something."  (Dkts. 145 at 16.)  The agent explained, "[t]his is a paper case . . . [a]nd it's a follow-the-money case    . . . [a]nd the evidence shows that what you're telling me . . . is bullshit.  So you're

not going to help yourself out by giving us a bunch of bullshit[.]" (Dkt. 145 at 16–17.) Defendant replied, "to the best of my ability, . . . I'll be plain and honest with you. Like when it comes to hard figures, I don't want to," to which the agent interrupted and said "I don't need a hard figure, okay?" (Dkt. 145 at 17.) The agent and Defendant then discussed some tractor-trailers on the property subject to a seizure warrant, the PPP loan, money from the loan that Defendant channeled into his new business, and income Kremkov purportedly made and kept in foreign bank accounts. (Dkt. 145 at 17–25.)

About seventeen minutes into the interview, the agent told Defendant he did "not need [him] to cooperate," and that "[t]he paper is what proves it." (Dkt. 145 at 25.) The agent said:

> [W]e don't need you to cooperate . . . like I said, I don't know how clear to you I can be, okay? The paper is what proves it. The paper and the flow of money . . . I don't want to see you get in any more trouble than what you're already in, that's why I was clear to you and explained to you how you can help yourself in the federal system. And I guarantee you[,] you speak to any attorney, . . . they will tell you the same thing. And I don't want you to sit back there later on and say, damn, he told me so.

(Dkt. 145 at 25.) Defendant then answered more questions about— among other things—his attempted name change, his purchase of certain

10

property with PPP funds (including tractor-trailers), a payroll list he gave Chase Bank to obtain the PPP funds, and Kremkov's operational history. (Dkt. 145 at 26–52.) He also signed a form giving agents permission to use his key fob to enter his garage and seize a car he owned. (Dkt. 145 at 52; Dkt. 92-2.)

According to one of the agents, they briefly stopped recording the interview when they thought it was over but reactivated the recording device when Defendant said he had more questions for the agents. (Dkt. 94 at 14, 16.) At that point, Defendant expressed concerns about how the agents conducted his arrest. (Dkt. 145 at 55.) He specifically said the agents could have come to his house, knocked on his door, and asked him to come out rather than arrest him with "M16s and AR-15s," which he thought "was a little bit dramatic" and "actually scared [him]." (Dkt. 145 at 55–56.) The agents told him it was standard procedure to protect officers. (Dkt. 145 at 56–57.)

One of the agents testified that Defendant appeared calm and alert throughout the interview and that everything he and the agents said was recorded. (Dkt. 94 at 18.) The agent also asserted that Defendant never said he wanted to end the interview, did not understand what the agents

said to him, wanted to speak to an attorney, or revoked his consent to talk to the agents without an attorney.  (Dkt. 94 at 17–18.)

## C.    Discussion

Defendant does not argue the agents failed to read him his *Miranda* rights, that he did not understand his rights, that he signed the consent form unwillingly, that he expressed any confusion about his rights, that he asked for counsel, or that he said he wanted to end the interview. Defendant even demonstrated some awareness about the investigatory process by saying to the agents that he "kn[e]w better than to lie to the FBI."  (Dkt. 145 at 9.)   And he refused to answer some questions. Defendant also does not claim any of his personal characteristics made it harder for him to understand or exercise his rights.  Indeed, the interview shows Defendant speaks fluent English, graduated from college, worked for the Army, and maintained a pilot's license.  (Dkt. 145 at 39, 41.)

Rather, Defendant claims his waiver was involuntary for three reasons: (1) the nature of his arrest was so intimidating as to be coercive; (2) the agent's statement that he would not "lock" Defendant into his answer about the number of employees violated the *Miranda* warning that anything he said could and would be used against him; and (3) the

agent's statement that "any attorney" would tell him to cooperate "undermined" his right to silence and counsel. (Dkts. 108 at 13–23; 123 at 4.)

### 1. Nature of Arrest

Defendant says the fact that "[t]here were at least ten agents, who travelled to [his] location in three or four vehicles, . . . surrounded [him] with their vehicles and quickly exited their vehicles, . . . [and] all pointed their guns at [him]," could "reasonably have [had] a coercive impact on [him]," given the agents "interrogated [him] immediately afterward." (Dkt. 123 at 4.) The Magistrate Judge concluded the nature of Defendant's arrest did not render his statements involuntary because the tone of his voice during the interview was "calm and conversational throughout" and because agents holstered their weapons during the interview. (Dkt. 128 at 24–25.) Defendant objects, arguing the Court should "take into account the nature of the arrest encounter and its impact on [Defendant,]" particularly given that he expressed his fear of the agents during the interview. (Dkt. 132 at 4–5.) The Court agrees with the Magistrate Judge.

A large number of agents at the scene of an arrest "does not indicate

a level of intimidation or coercion sufficient to render [the defendant's] waiver involuntary" if there is "no evidence that the agents at the scene 'employed any tactics that would augment the degree of coercion that is inherent in any arrest.'" *United States v. Vaughn*, 2023 WL 4409541, at *7 (N.D. Ga. June 15, 2023). In *Vaughn*, "four to eight agents" arrested the defendant during a vehicle stop. *Id.* While at least one of the officers initially had his gun drawn, "once [the defendant] was out of the vehicle," he secured the gun in his holster. *Id.* The officers only detained the defendant for "about two hours," and "the actual questioning of [the defendant] lasted no more than 40 minutes total." *Id.*

Defendant's arrest here is strikingly similar. Although several agents had their guns drawn when they initially encountered Defendant, they returned their weapons to their holsters once they placed him into custody. No one had a gun out during the interview. Agents also moved Defendant's cuffed hands from his back to his front, which—as far as the evidence shows—were loose enough not to cause him any pain. And Defendant's interview only lasted for a little over 40 minutes, so it was not that long.

That one of the agents told Defendant to get on the ground and

14

show his hands does not change the analysis. Officers undoubtably do that during the initial encounter for their own safety and for a suspect's safety. (One of the agents explained that to Defendant during the interview.) To hold such conduct excessive would render even the most mundane arrests so coercive as to render any subsequent waiver involuntary. And there is no evidence it had any such impact on Defendant here. Granted, Defendant said during the interview that the agents' guns scared him and that the arrest was "a little bit dramatic." But—as the Magistrate Judge noted—Defendant's tone was calm and conversational throughout the interview, including when he told the agents they had scared him. In fact, when he said the agents could have simply come to his house to arrest him, he even chuckled a bit. He did not sound like he was so shaken that he felt compelled to waive his *Miranda* rights. At most, he simply sounded annoyed at how the agents conducted the arrest. So, the Court concludes the nature of Defendant's arrest was not so intimidating as to coerce his waiver.

### 2.    Agent's "Promise"

Defendant contends the agent's statement that he would not "lock" him into his answers about the number of Kremkov employees renders

those answers inadmissible because the agent's statement was at odds with the *Miranda* warning that "anything a suspect says during the custodial interrogation can and will be used against him in court." (Dkt. 108 at 13.) He also says the agent's promise "distorted [his] ability to weigh the pros and cons of making a statement and going with the balance as it appeared at the time . . . [and] distorted [his] ability to weigh the consequences of making the statement." (Dkt. 108 at 19.) The Magistrate Judge concluded the agent's statement "was not an express assurance that [his] response would not be used against him" and that the rest of the interview shows Defendant understood "giving incorrect information would be detrimental to him." (Dkt. 128 at 27–28.) Defendant objects, saying the agent "contradicted" the *Miranda* warnings, "coaxed" him into answering his question about the number of employees, and "distorted" his ability to weigh the pros and cons of answering that question. (Dkt. 132 at 5–6.) Defendant is wrong.

As the Magistrate Judge explained, the agent's statement—when examined in context—is not a promise that Defendant's answer would not be used to prosecute him. The agent told Defendant several times that he did not need Defendant to cooperate to make a case against him

16

and that they had enough physical evidence to convict him—so Defendant did not need to lie. Indeed, Defendant said he knew he might face consequences for lying to the FBI.[4]  Almost right after he told the agent Kremkov had about 50 or 60 employees in the United States during the time in question, Defendant said, "I don't want to tell you something which is wrong and then . . . it'll appear as if I'm . . . deceiving you or something." (Dkt. 145 at 16.)  Clearly, then, Defendant knew the answer he gave the agent might be used against him, and he chose to say it anyway.  In context, the more natural way to read and interpret the agent's statement—and the way the circumstances suggest Defendant interpreted the statement—is that the agent was telling Defendant he

---

[4] Defendant suggests this fact actually cuts in his favor, because the notion the United States could prosecute him without his statement "bolster[s] rather than limit[s] the significance of [the agent] telling [Defendant] that he would not lock him into an answer regarding the maximum number of employees he had at Kremkov." (Dkt. 132 at 6–7.) According to Defendant, that assertion made it "all the more believable that [the agent] would not need to use" Defendant's statement to prosecute him. (Dkt. 132 at 7.)  But that argument ignores the fact that Defendant made it clear during the interview that he knew he might get into more trouble if he lied.  In the face of that, the Court simply does not buy the argument that the agent's statement made Defendant believe he could say whatever he wanted regardless of its truth without facing any consequences.

could ballpark a number rather than give a precise count, and that Defendant could later change his answer if he wanted. Indeed, that is the natural interpretation of the exchange—the agents asking him to "take a guess," saying that they would not "lock" him into that guess, and then reiterating they were asking for a "rough guesstimate." (Dkt. 145 at 14–15.) Defendant understood that, saying he would give "a rough guesstimate? Maybe 50, 60." (*Id.*) Neither the agent's statements nor Defendant's response suggests there was any confusion about the agent's request that Defendant provide an estimate that he could revise at a later time. As a result, this conversation could not possibly have caused Defendant to believe the agent was rescinding the warning that his statements could be used against him.

In arguing otherwise, Defendant cites *United States v. Castor*, 598 F. App'x 700 (11th Cir. 2015), *United States v. Lall*, 607 F.2d 1277 (11th Cir. 2010), and *Hart v. Att'y Gen. of Fla.*, 323 F.3d 884 (11th Cir. 2003), for the proposition that a defendant's statement is involuntary when it is offered in response to a promise that the statement will not be used against the defendant by the officers or anyone else. (Dkt. 132 at 6–7.) As the Magistrate Judge correctly concluded, however, the agent's

statement here was "qualitatively different from the statements made" in those cases. (Dkt. 128 at 26.) First, in *Castor*, the officer "misled" the defendant by "repeatedly" telling the defendant he could keep him out of jail if he cooperated and that he "could not charge [the defendant] with any additional" drug crimes. 598 F. App'x at 701, 703–04. Given these unequivocal promises, the Eleventh Circuit concluded the defendant's decision to waive his *Miranda* rights was "the product of [the officer's] deception." *Id.* Second, in *Lall*, the officers told the defendant that "any information [he] shared with the police would not be used to prosecute him," and that the officers weren't "going to charge him with any of this." 607 F.3d at 1281–82. The Eleventh Circuit again found the officers' promises not to charge the defendant with any crimes based on his statement rendered that statement involuntary, given that it impeded the defendant's understanding of "the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id.* at 1284 (internal quotation marks and citation omitted). Third and finally, in *Hart*, the officer told the defendant that "honesty wouldn't hurt him." 323 F.3d at 894. The Eleventh Circuit held that phrase "is simply not compatible with the phrase 'anything you say can be used against you

19

in court.'" *Id.*

The agent's statement here is nothing like the ones in *Castor*, *Lall*, and *Hart*. In those cases, the interrogating officers made unequivocal promises that the statements the defendants gave would not lead to criminal liability or otherwise hurt them. They were totally inconsistent with the warnings the officers had given the defendants under *Miranda*. In other words, "'semantic technicalities aside,'" the "'only plausible interpretation'" of the statements in those cases "was that the information the defendants provided would not be used against them by the officers or anyone else." *United States v. Santacruz*, 2022 WL 5239533, at *6 (N.D. Ga. July 22, 2022) (quoting *Hart*, 607 F.3d at 1287)). As already discussed, the agent's statement here—when viewed in context—simply meant that the agent was looking for an estimate from Defendant that Defendant could later revise. Even if the true purpose of the agent's statement was to later show an inconsistency between Defendant's answer and his PPP application (which showed a much larger number of employees), "trickery and deceit are prohibited only to the extent they prevent the defendant 'from understanding the nature of his rights and the legal consequences of waiving them.'" *United States v.*

20

*Santacruz*, 2022 WL 4554420, at *2 (N.D. Ga. Sept. 29, 2022) (quoting *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010)). Given the totality of the circumstances, nothing the agent said—even if meant as trickery—prevented Defendant from understanding his right to decline to answer the question or the consequences he might face in doing so. So, the statement does not render his waiver involuntary.

### D.    Statement About Attorney and Cooperation

Defendant says the agent's statement that "any attorney" would advise him to cooperate and truthfully answer the agent's questions rendered his subsequent statements involuntary because, among other things, it "undermined the right to counsel." (Dkt. 108 at 21.) While the Magistrate Judge admonished the agent's "imputation of a prospective attorney's advice," she concluded the agent's statement was not illegally coercive because it did not mislead Defendant as to the nature of his rights or the consequences he might face for waiving them. (Dkt. 128 at 30.) Specifically, the Magistrate Judge explained the rest of the interview shows Defendant understood and—in some instances—even continued to exercise his right not to answer questions without an attorney. (Dkt. 128 at 30–31.) Defendant objects, arguing the agent's

21

statement "realistically had an impact on the degree to which [Defendant] engaged in the interrogation and made statements." (Dkt. 132 at 8.) The Court agrees with the Magistrate Judge.

Immediately after the agent made the statement about a prospective attorney's advice, Defendant again said that he did not want to appear deceitful, conveying his understanding that his statements could be used against him. (Dkt. 145 at 26.) He also displayed his understanding that he could continue to exercise his *Miranda* rights— including the right not to answer questions without counsel present— when he subsequently refused to answer other questions about Kremkov's payroll list. (Dkt. 145 at 43–44 ("Honestly, I refrain from answering that question. . . . I don't want to answer that question. . . . I refrain from answering that question.").) Clearly, Defendant knew he could refuse to cooperate regardless of what the agent said, and he did just that. So, the Court cannot say the agent's statement misled Defendant about his rights.

In arguing otherwise, Defendant says the facts here "are not materially distinguishable from those in" *Hart* and another case, *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991), where courts found an

agents' statements about a lawyer's advice rendered the defendants' waivers involuntary. (Dkt. 132 at 8.) Defendant is wrong. First, in *Hart*, the defendant "asked the detective about the 'pros and cons' of hiring a lawyer, which indicated that he 'did not fully understand' his rights and was asking for clarification of them." *Farley*, 607 F.3d at 1329 (citing *Hart*, 323 F.3d at 894–95). Defendant did not exhibit any similar confusion here. Indeed, as just discussed, Defendant understood his rights and exercised them. Second, in *Beale*, the defendant waived his *Miranda* rights only *after* the agent told him doing so would not hurt him, indicating the agent "mis[led] [him] concerning the consequences of relinquishing his right to remain silent." 921 F.2d at 1435. Here, Defendant waived his rights *before* the agent made the statement, and he made incriminating statements before and after. So, anything he said before the agent's statement could not have been coerced, and the fact he continued to give incriminating answers (oftentimes related to his earlier admissions) afterwards suggests the agent's statement did nothing to coerce those later answers. Indeed, as the Magistrate Judge explained, most of Defendant's answers after the agent's statement "primarily expounded upon topics he had already disclosed," such as the tractor-

trailers and property he allegedly bought with the PPP money, the vehicle in his garage agents intended to seize, his name change, Kremkov's operational history, and Kremkov's payroll list. (Dkts. 128 at 32; 145 at 27–58.)  And, as already discussed, Defendant refused to answer some questions after the agent's statement.  So, considering the totality of the circumstances, the agent's statement did not render Defendant's waiver involuntary.[5]

---

[5] Somewhat relatedly, Defendant argues there might have been an unrecorded discussion between the agent and Defendant, during which the agent emphasized that Defendant's cooperation could help him, enhancing the coercive nature of the interview. (Dkt. 132 at 2.)  He points out that, even though the agent told Defendant—audible in the recording—"I was clear to you and explained to you how you can help yourself in the federal system," there is nowhere else in the recording where the agent says anything to Defendant about helping himself in the federal system.  (*Id.*)  The Magistrate Judge rejected this argument, concluding Defendant "fails to present sufficient evidence" of this discussion and essentially "requests that inferences be drawn . . . from utter speculation." (*Id.* (internal quotation marks and citation omitted).)  Defendant says the Magistrate Judge is wrong because—given the absence of the agent's discussion about the federal system anywhere else in the recording—"that discussion and advice . . . must have taken place at [the] time when the discussion . . . was not being recorded." (Dkt. 132 at 2.)  But that ignores that fact that no one asked the agent what he meant by his statement.  Mere speculation in the absence of evidence is not evidence.  None of this really matters.  Even if the agent emphasized the helpfulness of Defendant's cooperation during the unrecorded discussion, that does not change the Court's conclusion that Defendant's waiver was voluntary.  Again, the discussion would have taken place after Defendant already waived his rights, he continued to pick and

## IV.    Motion to Strike Surplusage

Defendant moves to strike from the indictment references to the alias Karl Lucius Delano because there is no evidence that his "name was ever formally changed." (Dkt. 81 at 2–3.) According to Defendant, any references to the alias are prejudicial and "unnecessary to any of the essential elements of the offenses charged." (Dkt. 81 at 2.) The Magistrate Judge concluded the alias allegations are relevant because the indictment claims Defendant used the alias to try to conceal his crimes. (Dkt. 128 at 36–37.) She also found that the United States presented evidence that Defendant successfully changed his name. (Dkt. 128 at 37.) Defendant objects in conclusory fashion, saying only that he "objects to the Magistrate's denial of his motion to strike surplusage from the indictment, which requests that [the alias] be stricken thr[o]ughout the indictment." (Dkt. 132 at 9.) The Court overrules the objection.

To start, Defendant's objection is improper, and the Court could simply disregard it. As already discussed, in objecting to a Magistrate

---

choose when he would answer the agent's questions, and nothing suggests the agent's emphasis on Defendant's cooperation confused him about his rights or the consequences of waiving them.

Judge's conclusions, a party "must specifically identify the portions of the [R&R] to which objection is made and the *specific basis* for objection." *McCullars*, 825 F. App'x at 694 (emphasis added). Where a party provides only "conclusory objections" to the R&R and does not "specifically [identify] the findings of the R&R that they object to . . . [t]he Court is not required to consider the[] objections." *United States v. Cobb*, 2017 WL 3225063, at *1 (N.D. Ga. July 28, 2017). Even assuming the Court must review the Magistrate Judge's findings for clear error, the Court sees no such error here.

Rule 7 of the Federal Rules of Criminal Procedure provides that, "upon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). To successfully strike surplusage, the defendant must show two things: (1) the allegations are "not relevant to the charge," and (2) the allegations "are inflammatory and prejudicial." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (internal quotation marks and citation omitted). This is an "exacting standard." *Id.* (internal quotation marks and citation omitted). Defendant fails on both prongs.

First, the alias allegations are clearly relevant to the charged

crimes. As the Magistrate Judge explained, the indictment alleges Defendant "petitioned to change his name . . . four months after he fraudulently received over $9.5 million in PPP proceeds in furtherance of his scheme to conceal the crime via money laundering," and that he "used the bank fraud proceeds to purchase real property under the [alias], but continued to deposit bank fraud proceeds into accounts under [his name]." (Dkt. 128 at 36–37.) So regardless of whether Defendant officially changed his name to Karl Lucius Delano, the United States claims his use of that alias was part and parcel of his overall scheme to illegally receive and conceal his use of the PPP money. As for Defendant's only contrary argument before the Magistrate Judge—*i.e.*, that he never legally adopted the alias—the United States provided evidence a court *did* grant his name-change petition. (Dkts. 83-2; 128 at 37.) So, Defendant fails to show the alias allegations are irrelevant to the charges.

Nor can Defendant show the allegations are unduly prejudicial. Like the Magistrate Judge explained, Defendant "through his own volition, petitioned to have his name legally changed," supposedly "because of his experiences with others mispronouncing it." (Dkt. 128 at

37.) He can argue this at trial. And the United States can counter that argument with evidence Defendant changed his name to further his criminal scheme. This is not a case where the United States is attempting to use Defendant's alias to "indicate to the jury that people who use aliases are inherently suspect." *See United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir. 1972). Rather, the indictment directly ties the alias to the charged conduct. So Defendant fails the second prong, too. The Court denies his motion to strike surplusage.

## V.    Motion to Sever

The indictment charges Defendant with ten counts: seven counts of fraud based on his acquisition and expenditure of the PPP funds; one count of aggravated identity theft also related to his acquisition of the PPP loan; and two counts of wire fraud related to his allegedly filing fraudulent tax documents. (Dkt. 110.) Specifically, the tax-related counts allege Defendant "electronically filed with the IRS not just one but two fraudulent U.S. individual income tax returns . . . for tax year 2020, both of which reported fictitious wages, withholdings, and nonpassive losses from Kremkov Industries." (Dkt. 110 ¶ 35.) Defendant purportedly fraudulently claimed more than $6 million in tax refunds.

28

(Dkt. 110 ¶¶ 36–37.)

Defendant moves to sever and separately try the tax-related counts. (Dkt. 115.)  He contends trying the tax charges with those related to his acquisition and expenditure of the PPP money would create "a substantial risk that a single jury would be inhibited in its ability to consider the evidence separately with respect to the different alleged schemes." (Dkt. 115 at 4.)  According to Defendant, "[a] single trial of all the counts would essentially allow the [United States] to present other-crimes evidence without satisfying the requirements of [Federal Rule of Evidence] 404(b) and without being subjected to the exclusionary discretion provided under Rule 403." (*Id.*)  The Court disagrees.

Rule 8 of the Federal Rules of Criminal Procedure says an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  If a joinder of offenses in the indictment "appears to prejudice a defendant . . . the court may order separate trials of counts, . . . or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).

Defendant essentially argues that the tax charges are so unrelated to his alleged scheme to fraudulently obtain and spend PPP funds that a jury could not "'compartmentalize evidence'" from each of the "separate alleged fraud schemes." (Dkt. 115 at 2–4 (quoting *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986).) And he says the jury's inability to do so will prejudice him given "the 'highly prejudicial nature of other-crimes evidence.'" (Dkt. 115 at 3 (quoting *United States v. Jones*, 67 F.3d 320, 322 (D.C. Cir. 1995).) But the indictment treats the conduct underlying the tax counts as a continuation of Defendant's overall scheme to illegally acquire and spend PPP funds. Defendant's subsequently filing tax returns for the sham business he used to obtain those funds shows his attempts to maximize the amount of money he fraudulently received. And the evidence the United States will have to present to prove the tax charges largely—if not entirely—overlaps with the evidence it must use to prove the other charges. Indeed, Defendant could not have filed those returns showing Kremkov's fake numbers had he not fraudulently created that business to receive the PPP funds. Defendant's conclusory argument that the tax counts constitute a different scheme does not change any of that. The Court denies

Defendant's motion to sever.

## VI.    Conclusion

The Court **OVERRULES** Defendant's Objections (Dkt. 132) and **ADOPTS** the Magistrate Judge's R&R (Dkt. 128).  The Court **DENIES** Defendant's Motion and Amended Motion to Suppress (Dkts. 44, 88), Motion to Strike Surplusage (Dkt. 81), and Motion for Severance of Counts (Dkt. 115).

**SO ORDERED** this 13th day of January, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE